Good morning, Your Honors. Have you fellows figured out how you're going to divide up your time? Your Honor, yes, we have. My name is Philip Borowski, and actually I represent the Madden plaintiffs. We have Madden v. Deloitte before you, Madden v. Boulpe, and Amin v. Deloitte. Mr. Shuman is counsel for Amin, and he's been gracious enough to allow me to take the lead in arguing. So as I understand it, I have 20 minutes to argue both cases, and so I'd like to save about five minutes for rebuttal for Deloitte and five minutes rebuttal for Boulpe, so that'll give me 10 minutes. Got you. Thank you. The trial court, Judge Whelan, in granting summary judgment, began his decision on OO-2868 with the following sentences. On March 20, 1998, the FJMC and OCMCS shareholders approved the merger. FBA issued shares of its common stock to plaintiffs in an off-market transaction. At that time, the SJMC and OCMCS shares had a combined market value of approximately $60 million,  Then the Court proceeds and states that plaintiffs did not establish tribal issues of fact as to materiality or loss causation. We presented, we think, very compelling evidence of materiality and loss causation. We've presented evidence of Richard Stevens, a highly esteemed auditor. If you just focus it on what specific genuine issues or issues of material fact do you contend that barred the district court from granting summary judgment? Material issues of fact were that the revenue recognition approved by Deloitte in 1996 that allowed FBA to present fictitious earnings in the 1996 financial statements that was audited, as well as in 1997 and in 1998, when Deloitte reissued its consent to the audit opinion of 1996 in February of 1998, that those financial statements, the 1996 financial statement, was materially misleading in that it allowed for fictitious earnings. You're talking about the $16.54 million? The $16.45 million. Or 45 or whatever. $16.45 million, which Deloitte, for purposes of summary judgment, concedes was a misrepresentation, was characteristic of a revenue recognition procedures that Deloitte specifically approved that allowed the fictitious earnings to go beyond 1996 into 1997 and 1998 that exceeded $55 million, right to the bottom line. Well, now, I know that Deloitte also presented expert testimony that the 1996 audit had little if any impact on investors and stock prices at the time the merger, given the passage of 15 months. Did you offer any evidence regarding that issue? Yes, Your Honor. What was that specifically? The evidence was Richard Stevens' two declarations before the Court on summary judgment. And I'm setting aside whatever we presented to the Court in the motion for reconsideration, that where Mr. Stevens, and I'm looking at excerpt of record 001421, states that there was 150 percent, well, I'll quote specifically from 001421. The inclusion of the $16.45 million in revenue, which is what you were asking me about, resulted in a distortion of FPA's loss from operations by over 150 percent, thus softening the blow with respect to the company's reported net loss for 1996. Mr. Stevens goes on to say that this masked the severe liquidity crisis that continued in 1996 and 1997 and 1998, that distorted earnings through that period of time until about 150 percent or more. We also, and I think one of the most compelling pieces of evidence that we presented to the trial court, is the last memorandum of March 4th, 1997, and that is 001448 and 001449, where Mr. Lash explains to Bank Paribas, a major lender, that if he didn't invent this gap, guaranteed access funds, it would eliminate the hope of raising equity in the future. We are we presented to the trial court, tribal issues of fact, that this invention Why did we have to, why did Mr. Lash have to invent some way to treat this transaction? Why couldn't he comply with generally accepted accounting principles? He says in this memo that if he didn't do that, it would eliminate the hope of raising equity in the future, which I submit would establish not only materiality, but loss causation. What's the evidence, though? I understand all you're saying and how perhaps using that treatment was big naughty and such. I understand that. What I'm not quite following is why or what basis are you saying that wasn't well known when it was first done, objected to by some people, I gather. Others said, well, we think it's fine to do it that way. But the point is the fact that the 16 was being stuck there wasn't some underhanded sneaky thing. It was right there on the face of it. Everybody knew it. And some people thought it was bad to have done it that way. It shouldn't have been done that way. Way back when, not at the time of this. It didn't just all that didn't just bubble up at the time of this transaction or after this transaction. That was known long before. It strikes me. What's the evidence that that's not true or why isn't that even relevant? Okay. You can answer either or both of those questions. I'll answer both questions. It's not relevant because this is not a 10 v. 5 case. This is not a fraud in the market case. We are suing based on Section 11 with respect to Deloitte with respect to material misstatements and the registration statement where reliance is presumed. Furthermore, if you look at, and I think, Your Honor, what you were referring to with respect to the market knowing it, I think you're referring to Professor Beaver's report where he cites a number of analysts that dispute the issue of what is this guaranteed access fund. Many of them relied on Deloitte. They said it passed muster with Deloitte. A number of them relied on Deloitte. The one analyst that came down strong and said this was a material misstatement was the center of financial resources, Mr. Schilt, who has a private you had to pay $3,000 for that. That wasn't publicly available. But even if it were, we're not talking about it would be publicly available if you paid $3,000 to get it. So the others commented upon that and said he's nuts. So people knew that somebody was saying it was wrong and other people were saying we think he's nuts, but the point is they knew there was something out there. Well, I don't think, Your Honor, in further answer to your question as to whether it's even relevant, that you're answering the second one right now. Go on. Well, what I was about to say was that there is no defense for a Section 11 case that there was a dispute in the marketplace that may have been inconsistent with the material assurances in the registration statement. This is not a 10b-5 case. This is a Section 11 case. And I think that's a very critical point in answer to your question, Your Honor. And the second is that there was a question about it didn't excuse Deloitte from his responsibility as the expert auditor who, by the way, was paid over $3 million by FPA and $38 million in audit fees and consulting fees from the other party to this transaction foundation. It doesn't excuse Deloitte from the responsibilities that Section 11 imposes upon it with respect to his audit opinion. May I proceed? Sure. You said you wanted to reserve 10 minutes, but you're welcome to keep going. Okay. I know the most important thing. We've tried to present our briefs as well as we can. I want to answer your questions. I think that's more important than me giving a speech. But I just want to take maybe one more minute to make a few more points. Professor Beaver's analysis, which is what Deloitte relies on, solely relies on with respect to loss causation, concludes, let's see if I can, concludes with the following language after a 36-page report. To summarize the two basic conclusions of my analysis, first, the alleged accounting deficiencies identified in the Stevens report relating to FPA's 1996 audited financial statements did not cause the stock price declines that occurred subsequent to March 20th, 1998. Second, the deteriorating, the stock price declines that, subsequent to March 20th, 1998, occurred because of announcements of deteriorating financial conditions for the first and second quarters of 1998, unfavorable prospective information regarding cash flows and the ability to meet debt payments. Eventually bankruptcy was declared. He doesn't link. Only Stevens, Mr. Stevens links that the announcements that were made in May of 1998 that Mr. Beaver here references relate directly to the foundation transaction that Deloitte specifically approved of the accounting in 1996 and allowed the fictitious earnings that continued in 1996, 97, and 98, that the purpose of that treatment, as Mr. Lash explained in the memo that I referenced earlier, was to create fictitious earnings in order to – because if he didn't, there wouldn't be any bottom-line earnings, or the losses would have been much greater, and it would have amassed the liquidity crisis that the new President, Mr. Dresnick, after he came into power after our merger agreement, figured he had to complain on and make this announcement to the public. So it all directly relates to the 1996 revenue recognition permitted by Deloitte that continued in 97 and 98, the material mischaracterization of the foundation transaction, taking what should have been a reduction from the purchase prices, guaranteed access funds, and instead treating it as goodwill, which, by the way, also caused Mr. Dresnick, as he testified in his deposition, to write down 75 percent of the goodwill that was pounded for by Deloitte in the 1996 audit opinion, which turned out to be about $94 million. We have a situation where within six weeks or seven weeks of our merger agreement, the company wrote down the entire equity of the company, and Deloitte hasn't explained it, Professor Beaver hasn't explained it, only Mr. Stevens has explained it. Now, I haven't said anything about your – What's the best thing in Stevens' report to help you with respect to the causation defense? If you look at the foundation transaction, you see that it's a liquidity crisis. That it masked a liquidity crisis that artificially inflated the value, the way the foundation transaction was treated in 1996 and the revenue recognition that was false, that violated GAAF, that continued through 97 and 98, masked a liquidity crisis, which was the very purpose of it according to Mr. Lash's memorandum, because if we didn't – he didn't invent this GAAF concept, it would eliminate hope of raising equity. Did he opine that that caused the stock price to decline? He opined that if the market had known that, it masked a liquidity crisis that no investor would have invested in it had he known the true facts. That was his opinion. Now, I haven't said anything about jurisdiction. I know I'm – you know, I said I was going to reserve ten minutes, so I've got six minutes left. Let me just – and I haven't said anything about Volpe. So let me maybe take five minutes and I just – if I could just indulge – if you could indulge me on that. Well, you're taking all your co-counsel's time. That's who you're asking indulgence for. Is that all right with you, Mr. Chief? I'll stand it up. Okay. With respect to jurisdiction, we submit – and I know this has been well briefed, but this is the first opportunity I've had to really talk to a court about this case, even though we're approaching the sixth anniversary of this decision. I'm not – I'm not complaining. I'm just noting that. We – we had argued before the Ninth Circuit back in 2000 that this matter was never intended to be preempted by the Security Litigation Uniform Standard Act. This is a very complicated merger agreement involving the livelihood of many doctors, many prominent physicians who traded their medical practices in order to – in exchange for stock in order to continue working at the FPA facilities and have long-term arrangements to take care of their patients, that SLUSA specifically applies to the misrepresentations in connection with the sale – contemporaneous with the sale of a listed security or security authorized for listing. Our stock – we didn't get our stock until well after a month after the merger – after the registration statement in February of 98 and several months after the execution of the merger agreement in January of 98. For this Court to conclude that SLUSA preempts this, I think, would defy the reasonable reading of the reason for the statute, which was to – Well, is the dispositive issue covered security? It is covered security, but I think in order to understand – yes, the answer is yes. But I don't think it's a covered security, because the living – Right. That's your argument, but that's where we focus. Right. That's the dispositive issue. But, I mean, I just wanted to say one word about the background, that I didn't want the Court to think that it was somehow frustrating the purpose of Congress by having this type of analysis of covered security. There is very reason to believe that Congress intended its statute to apply to anything but the strike suits that class action lawyers were filing at the drop of a hat when the stock price declined that was publicly traded, not a complicated merger agreement like we have now where the stock wasn't even in existence. What precise statutory language exempts this transaction? I'm sorry, Your Honor? What precise statutory language exempts this transaction in your view? What language in the statute as opposed to stuff about congressional intent and policy and that sort of thing? What in the statute exempts it? I'm not focusing on what exempts it. I'm focusing on what, you know, what preempts it. What the defendants have relied on to say there's preemption. What in the statute says it does not cover this? It doesn't say it doesn't cover it. What language of the statute are you relying upon, in other words? I believe, well, I have to turn to the language, but the specific. Let me pull that. It's page 44. I'm quoting from page 44 of our Madden v. Deloitte brief, our opening brief. If I may read it. It says, and this is from 15 U.S.C. section 77PB through C. The term covered security means a security that satisfies the standards for a covered security specified in paragraphs 1 or 2 of 77RB of this title at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred, except that such terms should not include any debt security that is exempt from registration under this title pursuant to rules issued by the commission under section 77D2 of this title. Now, there was earlier language that was rejected by Congress that said that if there is – if you have a publicly traded company that has stock listed at the time, any new issue doesn't change the preemption. But Congress didn't accept that. You know, we address that in our briefs. Okay. I've got 1 minute and 11 seconds left. Let me just – if I could just talk about Volpe's liability besides the issue of jurisdiction. Volpe received a contingent fee – was to get a contingent fee upon closing of the transaction. And we believe that it qualifies – and it was a necessary link to the distribution of the stock that we eventually received. So we believe because it received a contingent fee – it was supposed to receive a contingent fee. It didn't receive one because the company went bankrupt before it could pay it. But it was supposed to receive a contingent fee, approximately $750,000 based on the $60 million merger price. And it was in direct communications with plaintiffs' representatives and made misrepresentations of – regarding the earnings of FPA, stating that it never missed – Was the evidence undisputed that VBW did not underwrite any part of the registration statement, had no role in preparing the prospectus, and did not participate in the stock's public offering? Is that undisputed? Well, when you – it's a loaded question. I'll answer your question the best I can. Does that mean it's a good question? It's a good question. It's disputed that there were underwriters. We're saying there were statutory underwriters, not an underwriter in the conventional sense, but an underwriter under the 1933 Act because it participated in either directly or indirectly in the distribution of the sale of the stock. And by the way, if you follow Volpe's argument, they're saying they're not liable because nothing was public until – by the time they got out, which I think also fortifies our position that we are not talking about misrepresentations in connection with the cover security because Volpe's whole argument is that there was no security publicly traded at the time that was – that was involved with their work, which I think, as I say, is another basis for finding that their solicitation doesn't apply. You asked me, Your Honor, whether it's some – I think I answered the question about whether they're an underwriter. That is disputed. Whether they involved in the public offering. The public offering eventually wouldn't have occurred absent their misrepresentations. So I believe they're liable as a seller, too, as we argue in our brief under Section 12-2, as well as a statutory underwriter under Section 11. Thank you, Mr. Barofsky. Thank you. Gentlemen. Good morning. Good morning. May it please the Court, Daryl Snyder, Heller Erman for Deloitte & Touche. I'm sharing time today with counsel for Volpe. We've discussed previously. I'm going to try to go about 13 minutes or so. So are you going to really share? He said he was going to share, too. I'm going to try to really share. I think I have an easier job today. Judge Wayland's summary judgment decision should be affirmed. Even though there's de novo review in this Court, from reading his opinion, it is clear that Judge Wayland followed a very careful and disciplined analysis of the contours of Section 11 as applied to auditors and as set forth in both the statute itself and in case law. The district court correctly held that Deloitte was entitled to summary judgment on two alternative grounds, materiality and loss causation. Undisputed facts and unrebutted expert testimony demonstrated that everything there was to know about these GAF payments, the $16.45 million, or another way to say it, the 150 percent that my opponent just referred to today. So you entered that you put in the expert testimony and, you know, counsel for the appellant stated that the declaration he directed us to rebutted that. What's your response to that? He's wrong. First of all, we put in reports from two different experts. We put in Mr. Professor Beaver's report on both materiality and loss causation. He did the event study. And they did not respond or rebut anything in Professor Beaver's testimony. We also put in an accounting expert, William Holder of USC. That was not for purposes of summary judgment. That was for purposes of trial if we ever got into the accounting issues and whether the accounting was right or wrong. But we've assumed for purposes of this motion, as we did below with Judge Wayland, we've assumed that there's a misstatement in 1996 because we wanted to focus our materiality on loss causation. Professor Beaver's report and his name is never once mentioned in either of the two Stevens reports. One will look in vain to find not only a reputation of Professor Beaver but even any reference to Professor Beaver's report. What requires that he mention Beaver by name? All he has to do is come forward. I mean, Beaver didn't mention Stevens by name, I presume. What requires... I mean, I asked Mr. Borowski a minute ago, what's the best thing in Stevens' report that should have prevented summary judgment? You heard what he said. Why isn't that adequate? Well, it's not adequate, and I think, Your Honor, Judge Silverman, you were right on at that point. The only thing he could point to was a statement about the $16.45 million being a misstatement in 1996. That's an accounting issue which is assumed for purposes of this argument. And then he said, and it causally was related to their decision to purchase. Now, that's a transaction causation argument. Again, we did not make a transaction causation argument. So I think what one would do is one would look at Mr. Stevens' report and one would say, is there anything in there that goes to whether or not all the information about the GAF payments in 1996 had found its way into the market and either related to some inflation of the stock price on March 20, 1998, when they bought, or related to the decline in the stock price after March 20, 1998, when they had not bought. And as this Court knows, under the governing law of TSC and of convergent technologies in this circuit, the test, even in Section 11 cases, the test on materiality is whether or not the information that supposedly was omitted and is later revealed significantly altered the total mix of information available. Professor Beaver said, and this is what's unrebutted, Professor Beaver said the following. He said all of that information was well known and found its way into the market and was fully reflected in the stock price long before March of 1998. How do we know that? We know that because it was covered by all of these analysts, as Judge Fernandez was referring to, and including the one that was most critical, that was repeated in other analysts' statements. Even if it was one that had to be bought by other people, it was repeated by everybody. So whether it was good or bad or indifferent on the accounting treatment, the important fact for materiality is it was all out there in the public domain. And that happened in 1996 and 1997. There were no new disclosures or revelations, and Mr. Stevens doesn't point to a single one in 1998 that related in any way to the decline in the stock price. So now they say it really doesn't matter. Who cares if the market knew all about it? That's not relevant to our cause of action. How do you answer that? Well, that's wrong, because he's trying to argue from 10b-5. If you look at the Section 11 cases, materiality and loss causation are essential elements of every securities law violation case, whether it be 10b-5 or a Section 11 case. On materiality, that is an essential element of their claim upon which they have the burden. On loss causation, it's an affirmative defense upon which we have the initial burden. With respect to what we submitted from Dr. Beaver, and as Judge Whalen said, it was the only evidence on the subject on materiality, they were unable to carry their burden because our evidence was uncontradicted. He used an event study methodology. He looked at all of the information out in the marketplace. He looked at the responsiveness of FPA stock to that information. He looked at those days in which there were significant movements in the stock, and he could not find a single one of those that was related to the so-called 1996 misstatement, which are these GAF payments. He then so that's the first prongs. He said, I'm going to prove that there was no inflation in the price of FPA stock on March 20th, 1998, the day that they closed the merger and they got their stock. You only have to negate loss causation. You only have to do one of two things, but he did it both ways. He not only showed that there was no inflation, he showed that there was no causal relationship to the price stock decline in 1998. He said it was not related to the GAF payments because that was known 15 months ago, and it was too small, and it was nonrecurring. There were all kinds of things about the GAF payments that meant that it was having no impact on the price in 1998. How does Stephen's comment about causation tie into that? I didn't hear the first part. How does the opposing experts' comment about causation tie into that? I thought when you asked about it, they said, well, we're not talking about causation. But it sounds like now we are talking about it. So if you're going to say that there's no causation, no loss causation, then the question is how does the opposing experts' evidence tie into that? Okay. I think here we're at the distinction between transaction causation on the one hand, which is like reliance, and proximate causation or loss causation. Reliance is not a requirement of Section 11. Transaction causation is not an element, therefore, of Section 11. Our expert did not address transaction causation for that reason. He only addressed materiality and loss causation. Their expert failed to perceive that difference, and the one statement he made was a statement about transaction causation or reliance. He said these investors would not have bought but for the misstatement. Well, since reliance is presumed, we're not arguing about that. What their expert didn't do is didn't go on to say, okay, the stock dropped. Well, first of all, the stock was inflated by this much, and here's why, and demonstrate that part of that inflation on the price of the stock was related to the GAF payments. He never did that. Then he never did the second thing. He didn't even go and look at the drop in the price of the stock in 1998 and say that was related to some revelation or disclosure about the GAF payments. If you contrast that with what Professor Beaver did, Professor Beaver then identified the actual events and revelations in 1998 that caused the price to drop. It had to do with the liquidity of the company. It had to do with poor first-quarter earnings disappointing to the market. It had to do with a forecast that the second-quarter earnings were going to be disappointing. It had to do with some restructuring and write-offs. It had to do with a resignation of the top executives. It had to do with an analysis by management that they were going to fundamentally change the nature of the business. That's what caused the price to drop. That's what loss causation is about. That's what you'll find if you look at Northern Telecom, if you look at the Goldcrans case, or if you look at Imperial Credit, which is a case in this circuit. In all of those cases, to show loss causation, you have to use a scientific method, like an event study, and to rebut an event study, like Professor Beaver used here, ordinarily speaking, you can't come and just offer either lawyer arguments or some generalized opinion. That was tried, for example, by the expert, Mr. Torkelson, in the Northern Telecom case, and the Court said it doesn't work. You can't meet a very thorough method of the event study that looks at all these things through regression analyses and statistical analyses. You can't just meet it with a single conclusory statement that I think somehow it was related to the losses. And so here, for them, unfortunately, Mr. Stevens only came forward, really, with a fairly lengthy critique of Bill Holder's report, being our accounting expert. But that was never at issue on this motion for summary judgment. We are not arguing here today whether or not the GAF payments were right or wrong, GAF or not GAF. We're assuming that they were wrong and not GAF, just for purposes of this motion. So the real issue comes down to, have they come forward with any evidence? Did they come forward in summary judgment with any evidence whatsoever that would rebut the showing that we made on materiality and loss causation? And they did not. I'd like to turn to a couple other statements with respect to the obligation of an auditor. It's very important not only that we look at Section 11 and what it actually covers. It only covers statements that were made in the registration statement itself. It doesn't cover other statements made outside the registration statement. It has to be a statement in the registration statement. So then you go to the next question. What statement by Deloitte and Touche found its way into the registration statement? And it has to be the 1996 financials, the year ended December 31, 1996. The reason is, and we know that, is because those are the only audited financials that made it into the registration statement. All this stuff about 97 and quarterlies and 98, that's not in the registration statement. And so since it's not in the registration statement, it doesn't count under Section 11. Okay. The second step is, what type of statement is a Section 11, potentially a Section 11 claim against an auditor? And the statute clearly provides, this is a reading from Section 11 of the 33 Act, it has to be a statement or a report that was either prepared by or certified by the accountant. Okay. That is why, in fact, they have focused all their efforts on the GAF payments in 1996, because the GAF payments in 1996 were the only thing that found its way into the December 31, 1996 financial statements that their expert identified as being problematic or a possible misstatement. Okay. All this other stuff that Mr. Barofsky referred to didn't find its way into those 1996 financial statements. And we've cited several cases. The Monroe v. Hughes case supports what I have just said about the responsibility of auditors. If you look at the Adair case in the Southern District of New York, if you look at Judge Ingram's opinion in this in the Northern District on the McFarland case, talks specifically about what auditors' responsibilities are in these circumstances. They're very limited. We have to follow the statute. We have to follow the case law. And you can't just throw up a lot of 10b-5 stuff in a Section 11 case and say something bad happened, like you might say to the jury, and therefore the auditor is responsible. This is a different beast. Let me just turn very quickly with my remaining minute to talk about SLUSA. With respect to SLUSA, all that is important to know here is that this stock, FPA common stock, was traded on a national exchange, NASDAQ, at the time of the alleged misrepresentations. In the definition that Mr. Barofsky just read you, right from the statute itself, it talks about whether or not it's a covered security at the time of the transaction. And as Judge Fernandez said in another case, it would be middling strange for this not to be covered by SLUSA, although he was not in the SLUSA case at the time. And the reason is because if you look at the broad purpose, the legislative history, you look at the plain meaning of what is in the statute under SLUSA, it clearly covers all class actions that involve those securities that Congress wanted to be under the federal jurisdiction. It wanted all securities traded on the New York Stock Exchange, NASDAQ, any of these national exchanges. All it has to be is listed. It matters not whether or not it was registered in their name at that moment in time. That is not the test. That issue has been looked at and rejected. That is not the test. And it also matters not that this exception was considered by Congress. All Congress was considering is whether they even ought to have something broader, which said if you have one type of security, let's call it common, that is traded on a national exchange, that should somehow exempt you and it should be part of a covered security. If you come out with another offering of preferred stock or debentures or some other type of stock but not common stock. And so all Congress really said was if you have common stock that's traded on a national exchange, then that common stock, if it's listed as a covered security, period, end of discussion. And to follow what Mr. Barofsky said or suggested here would not only be a great expansion of the law, it would take the U out of SLUSA. In other words, it would take away the uniformity that was sought by Congress in SLUSA itself to follow that rule. Thank you. Roberts. Thank you, Mr. Smither. Good morning, Your Honors. Good morning. The district court correctly. Your name, sir? I'm sorry. I'm Peter Root with Orrick Harrington. Thank you. Representing Volpe, Brown, Wheelan & Company. The district court correctly granted summary judgment for Volpe because Volpe played no role and had no involvement in the public offering by which the plaintiffs acquired FBA shares. Volpe's sole role was as financial advisor to FBA, the acquiring company, in its merger negotiations with the two corporations in which plaintiffs owned shares. That was Orange Coast Managed Care Services and St. Joseph's Medical Corporation, which I'll refer to. So it was all pre-merger merger and that was it? All pre-merger. Volpe's role ended when the merger agreement was entered into by the two parties to the merger, FBA on the one hand, Orange Coast on the other. And a merger agreement, excuse me, a merger involves, in the first instance, a business deal between the merging parties. And the merging parties oftentimes hire investment banks to act as financial advisors, to value the other side's business, to assess merger synergies, to advise the client on the merger terms, and to participate in the merger negotiations. That happened here. Orange Coast, when it was looking to sell its businesses, hired Cowan & Company as its financial advisor. Cowan & Company then assisted Orange Coast throughout the process of Orange Coast trying to sell itself. Cowan & Company prepared a confidential offering memorandum. It contacted potential buyers confidentially. Each potential buyer had to sign a confidentiality agreement. One of the ten or so potential buyers that Orange Coast contacted was FBA. Volpe is FBA's advisor, right? That is right. So what are they doing calling Cowan and touting the deal, touting the merger, having phone conversations with various people on the other side of the transaction? Volpe, as financial advisor to FBA, is primarily contacting its counterpart, as it was to do under the protocol. In other words, it is representing FBA in the negotiations. It is submitting acquisition bids to Cowan and then assisting FBA in doing due diligence on Orange Coast and assisting FBA in negotiating the terms of the merger to determine whether and on what terms there was going to be a merger here. And Volpe had conversations with Orange Coast executives as well, is that right? With management, that's right, the CEO of Orange Coast, the CFO of Orange Coast, and a special advisor or an advisor to the special committee. This is a gentleman by the name of Peter Wendell. It was a single, unsolicited telephone conversation with him as well. But that was the sum total. And the dispositive point is that all of these conversations took place before the registered offering occurred. There was no communication from Volpe to anyone, be it Cowan, be it anyone in management of Orange Coast, let alone the shareholders of Orange Coast. No communications at all. The merger agreement was signed January 21, 1998. By rule, the act of submitting, and this is SEC Rule 145, which is the pivotal rule here, the act of submitting the executed merger agreement to the shareholders of the company being acquired here at Orange Coast, that act is deemed to involve a public offering of shares of the acquiring company. The rule was passed in 1972. Prior to that, no part of the merger process, even the exchange of shares, was deemed to involve an offer of sale of securities, and so the registration requirements of the 33 Act didn't apply, nor did Section 11 and Section 12A too. But since 1972, the SEC Rule 145 says if you're going to, when you submit the executed merger agreement to the shareholders of the company being acquired for their approval, that is subject to the registration requirements of the 33 Act. Therefore, a registration statement needs to be prepared and filed, and of course the registration statement includes the proxy statement of the company being acquired here at Orange Coast, and it includes the prospectus of the acquiring company. It is that document, the proxy statement prospectus, that solicits the shareholders to vote in favor of the merger. Thank you very much, Mr. Root. I'll start that one minute. If you promise to keep it to a minute. One minute. One minute. I know that's a mistake because everybody's going to be watching the clock, but I'll be one minute. I just want to emphasize that everything in the public domain, when you talk about the analyst's comments that Mr. Snyder referenced, was couched with the approval of the Leutentuch being the auditor and reviewing it and it being in a past muster. So it kind of bootstraps the whole issue as to did we all, the whole market, aside if we had to prove truth on the market defense, if that was the issue, which we don't think it is because it's a Section 11 case, that it was all misled, misrepresented through Deloitte and Leutentuch's audit. The market didn't know about the earnings management. They didn't know about the last memorandum. They didn't know bankruptcy was imminent. The write-down of $94 million by Mr. Dresnick's announcement on May 15th, 1998, was directly related to the 1996 audit of FPA. The liquidity of the company was exactly what Deloitte and Leutentuch's actions masked. Revenue recognition is critical in this case. And I just want to close with a statement from Ganino, which talked about the Staff Accounting Bulletin, which 99, SEC Staff Accounting Bulletin 99, which is discussed in our briefs at various places, that various qualitative factors may cause misstatements of qualitatively small amounts to be immaterial because the whole concept is trying to manipulate earnings to meet Wall Street expectations, which is exactly what the SEC does not want to happen. Roberts. Thank you, Mr. Barreski. Mr. Schneider, Mr. Rood, thank you as well. The case just started. You just submitted it. Good morning.
judges: Fernandez,silverman,callahan